UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nails Construction Company, Newell
Abatement Services, Inc., Lead Investigative
Services, Inc., Derrick Woodson, and Frederick
Newell, on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.                                                                                       Civ. No. 06-2657 (JNE/SRN)
                                                                                      ORDER

The City of St. Paul,

      Defendant.

---

Thomas F. DeVincke, Esq., Bonner & Borhart LLP, appeared for Plaintiffs Nail Construction Company, Newell Abatement Services, Inc., Lead Investigative Services, Inc., Derrick Woodson, and Frederick Newell.

Eric D. Larson, Esq., Assistant City Attorney, Office of the Saint Paul City Attorney, appeared for Defendant City of St. Paul.

---

      This is a putative class action brought by Nails Construction Company, Newell Abatement Services, Inc. (Newell Abatement), Lead Investigative Services, Inc. (Lead Investigative), Derrick Woodson, and Frederick Newell (collectively, Plaintiffs) against the City of St. Paul (City). Plaintiffs seek declaratory, injunctive, and monetary relief to redress the City's alleged violations of Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u (2000) (amended 2006). The case is before the Court on Plaintiffs' motion for a preliminary injunction and the City's motion for summary judgment. The City contends that Plaintiffs lack standing and that no private right of action to enforce section 1701u exists. For the reasons set forth below, the Court denies Plaintiffs' motion and grants the City's motion.

## I. BACKGROUND

Plaintiffs include three Minnesota corporations owned in part by Newell. Nails Construction provides carpentry services. Newell formed Nails Construction in 2004 and owns 50% of its shares. Newell Abatement was established in 1995 and has been a Minnesota corporation since 1999. It engages in lead and asbestos abatement, demolition services, and lead-risk assessment. Lead Investigative was formed in 2001, and it engages in hazardous waste remediation, Brownfield clean-up, and lead-risk assessment. Newell and his two brothers own both Newell Abatement and Lead Investigative.

The purpose of Section 3 is "to ensure that the employment and other economic opportunities generated by Federal financial assistance for housing and community development programs shall, to the greatest extent feasible, be directed toward low- and very low-income persons." 12 U.S.C. § 1701u(b). The City receives assistance covered by Section 3.

Plaintiffs claim to be business concerns or low-income or very low-income persons within the meaning of Section 3. *See id.* § 1701u(e). As such, Plaintiffs assert that they are entitled to enjoy the economic benefits set forth in Section 3. *See id.* § 1701u(c)-(d). They allege that the City has failed to comply with Section 3 in numerous ways: (1) failure to award a sufficient percentage of contracts to Section 3 business concerns; (2) failure to exercise oversight over contractors hired with Section 3 funds to assure that the contractors provide training, employment, and contracting opportunities to Section 3 persons and business concerns; (3) failure to meet Section 3's reporting requirements; (4) failure to "seek out and identify Section 3 [b]usiness [c]oncerns about contracting opportunities"; (5) failure to notify Section 3 persons about training and employment opportunities; (6) failure to train and employ Section 3 persons; (7) failure to provide preferences to Section 3 persons in training and contracting

opportunities; (8) failure to provide preferences to Section 3 business concerns in contracting opportunities; and (9) failure to file form HUD-60002.

## II.     DISCUSSION

### A.     The City's motion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*1.     Standing*

The Court first considers whether Plaintiffs lack standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."); *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (stating that plaintiff's lack of standing leaves district court without subject matter jurisdiction). To satisfy constitutional requirements of standing, a plaintiff must establish three elements:

3

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560-61 (citations and footnote omitted); *see Young Am.*, 424 F.3d at 843. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The Court turns to whether Plaintiffs have submitted evidence to demonstrate their standing.

The Court first considers the corporate plaintiffs. Nails Construction, Newell Abatement, and Lead Investigative do not identify any opportunities covered by Section 3 that they sought or will seek from the City.[1] Nor is there any evidence that Nails Construction, Newell Abatement, and Lead Investigative asked the City to recognize them as Section 3 business concerns. Finally, Nails Construction, Newell Abatement, and Lead Investigative do not explain how the City's alleged violations of Section 3's reporting requirements injured them. Viewed in the light most favorable to Nails Construction, Newell Abatement, and Lead Investigative, the record reveals that they have not experienced an injury in fact that is fairly traceable to the City. The Court therefore concludes that they lack standing. *Cf. id.* at 573-74 (stating that plaintiff's assertion of a "generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article

---

[1] The Court notes that Newell's affidavits repeatedly attribute conduct by the St. Paul Public Housing Agency (PHA) to the City. The PHA is not the City, but rather an independent governmental unit created by the state legislature in 1977. *See* Act of May 20, 1977, ch. 228, 1977 Minn. Laws 368, 368-69.

4

III case or controversy"); *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (per curiam) ("There is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 55-57 (D.C. Cir. 1991) (holding organizational plaintiff lacked standing to challenge government's alleged failure to extend Indian hiring preference to positions for which members did not apply).

The same conclusion is warranted with regard to the individual plaintiffs. Neither Woodson nor Newell identifies any opportunities covered by Section 3 that he sought or will seek from the City. There is no evidence that Woodson or Newell sought the City's recognition as a Section 3 person.[2] Finally, there is no evidence that the City's alleged reporting violations injured Woodson or Newell. Viewed in the light most favorable to Woodson and Newell, the record reveals that they have not experienced an injury in fact that is fairly traceable to the City. The Court therefore concludes that they lack standing.

  2. *Private cause of action*

If Plaintiffs were able to demonstrate standing, the City would be entitled to summary judgment because no private right to enforce section 1701u exists. Plaintiffs contend that they may enforce section 1701u under 42 U.S.C. §1983 (2000) or an implied right of action. Different inquiries determine whether a statute may be enforced pursuant to section 1983 and

---

[2] In one of Newell's affidavits, Newell asserts that he attended a meeting in June 2000 that the City held to identify lead-abatement contractors to work on a program using funds from the Department of Housing and Urban Development. At that meeting, the City allegedly responded to Newell's expressed interest in working with the City by declining to add to its list of contractors. There is no evidence that the June 2000 meeting related to a program covered by Section 3. *See* 24 C.F.R. § 135.3 (2006). In addition, there is no evidence that Newell was a Section 3 person at the time of the June 2000 meeting.

5

whether a statute implies a private right of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). The inquiries, however, "overlap in one meaningful respect":

> [I]n either case [a court] must first determine whether Congress *intended to create a federal right*. Thus, [the Supreme Court has] held that "[t]he question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative" where a "statute by its terms grants no private rights to any identifiable class." For a statute to create such private rights, its text must be "phrased on terms of the persons benefited."

*Id.* at 283-84 (citation omitted). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

In *Gonzaga*, the Supreme Court offered Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 as examples of statutes that create individual rights "because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'" *Id.* at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979)). Title VI provides: "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (2000) (emphasis added). Title IX states: "*No person* in the United States *shall*, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (2000) (emphasis added). Where a statute lacks "this sort of explicit 'right- or duty-creating language,' [a court] rarely impute[s] to Congress an intent to create a private right of action." *Gonzaga*, 536 U.S. at 284 n.3; *see Lankford v. Sherman*, 451 F.3d 496, 508-09 (8th Cir. 2006) ("[T]he statute must focus on an individual entitlement to the asserted federal right, rather than on the aggregate practices or policies of a regulated entity, like the state."). The Court turns to whether section 1701u creates private rights.

Section 1701u begins with congressional findings. 12 U.S.C. § 1701u(a). Briefly summarized, Congress found that certain federal assistance produces significant employment and other economic opportunities that should be directed to low- and very-low income persons. *Id.* Section 1701u continues with an announcement of congressional policy:

> It is the policy of the Congress and the purpose of this section to ensure that the employment and other economic opportunities generated by Federal financial assistance for housing and community development programs shall, to the greatest extent feasible, be directed toward low- and very-low income persons, particularly those who are recipients of government assistance for housing.

*Id.* § 1701u(b). To carry out that policy, section 1701u repeatedly directs the Secretary of Housing and Urban Development to take certain actions with regard to recipients of certain assistance. In general terms, section 1701u directs the Secretary (1) to require that housing agencies, and their contractors and subcontractors, make their best efforts, consistent with other laws and regulations, to give opportunities generated by certain assistance to low- and very-low income persons, and (2) to ensure that recipients and beneficiaries of certain assistance, to the greatest extent feasible and consistent with other laws and regulations, extend opportunities to low- and very-low income persons.[3]

---

[3]   Section 1701u(c)(1)(A) states:

> The Secretary shall require that public and Indian housing agencies, and their contractors and subcontractors, make their best efforts, consistent with existing Federal, State, and local laws and regulations, to give to low- and very low-income persons the training and employment opportunities generated by development assistance . . ., operating assistance . . ., and modernization grants . . . .

The efforts required under section 1701u(c)(1)(A) must be directed in the order set forth in section 1701u(c)(1)(B).

Section 1701u(c)(2)(A) provides:

> In other programs that provide housing and community development assistance, the Secretary shall ensure that, to the greatest extent feasible, and

7

Section 1701u seeks to benefit low- and very-low income persons, but "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" pursuant to section 1983 or an implied right of action. *Gonzaga*, 536 U.S. at 283. Section 1701u focuses not on an individual entitlement to the opportunities generated by federal financial assistance for housing and community development programs, but rather on the Secretary of Housing and Urban

---

consistent with existing Federal, State, and local laws and regulations, opportunities for training and employment arising in connection with a housing rehabilitation (including reduction and abatement of lead-based paint hazards), housing construction, or other public construction project are given to low- and very low-income persons residing within the metropolitan area (or nonmetropolitan county) in which the project is located.

Section 1701u(c)(2)(B) directs that priority should be given "[w]here feasible" to certain low- and very-low income persons.

Section 1701u(d)(1)(A) states:

The Secretary shall require that public and Indian housing agencies, and their contractors and subcontractors, make their best efforts, consistent with existing Federal, State, and local laws and regulations, to award contracts for work to be performed in connection with development assistance . . ., operating assistance . . ., and modernization grants . . ., to business concerns that provide economic opportunities for low- and very low-income persons.

The efforts required under section 1701u(d)(1)(A) must be directed in the order set forth in section 1701u(d)(1)(B).

Section 1701u(d)(2)(A) states:

In providing housing and community development assistance pursuant to other programs, the Secretary shall ensure that, to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations, contracts awarded for work to be performed in connection with a housing rehabilitation (including reduction and abatement of lead-based paint hazards), housing construction, or other public construction project are given to business concerns that provide economic opportunities for low- and very low-income persons residing within the metropolitan area (or nonmetropolitan county) in which the assistance is expended.

Section 1701u(d)(2)(B) directs that priority should be given "[w]here feasible" to certain business concerns.

Development. *See* 12 U.S.C. § 1701u(f) (directing Secretary to consult with other agencies "to carry out" section 1701u). Again, the Secretary is charged with ensuring that "best efforts, consistent with existing Federal, State, and local laws and regulations" are made and that opportunities are extended "to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations." Thus, the focus of section 1701u is at least two steps removed from the interests of individual low- or very-low income persons. Accordingly, Section 1701u does not create individual rights. *See Gonzaga*, 536 U.S. at 287; *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Moreover, the standards set forth in section 1701u—"best efforts, consistent with existing Federal, State, and local laws and regulations"; "to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations"; and "[w]here feasible"—are too general to confer individual rights.[4] *Cf. Lankford*, 451 F.3d at 509 ("The only guidance Congress provides in the reasonable-standards provision is that the state establish standards 'consistent with [Medicaid] objectives'— an inadequate guidepost for judicial enforcement.").

In short, section 1701u does not contain language that creates rights. Rather than focusing on individual entitlements, its provisions focus on the Secretary and set forth broad standards. Accordingly, the Court concludes that section 1701u does not create rights

---

[4] Plaintiffs rely on *Ramirez, Leal & Co. v. City Demonstration Agency*, 549 F.2d 97 (9th Cir. 1976), to support their assertion that section 1701u "creates sufficiently specific and mandatory requirements to support a private cause of action." *Ramirez* remarked that "greatest extent feasible" is "strong language" and that "'greatest extent' means what it says, the maximum." The version of section 1701u interpreted in *Ramirez* did not contain the qualification "consistent with existing Federal, State, and local laws and regulations." 549 F.2d at 99-100.

9

enforceable under either section 1983 or an implied right of action.[5] *See Gonzaga*, 536 U.S. at 290 ("In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.").

**B.     Plaintiffs' motion**

Because Plaintiffs lack standing, the Court denies their motion for a preliminary injunction. If Plaintiffs were able to establish standing, the Court would deny their motion because they may not enforce section 1701u under either section 1983 or an implied right of action. *See Newton County Wildlife Ass'n v. United States Forest Serv.*, 113 F.3d 110, 113 (8th Cir. 1997) ("If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied.").

### III.     CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.     Plaintiffs' motion for a preliminary injunction [Docket No. 7] is DENIED.

2.     The City's motion for summary judgment [Docket No. 9] is GRANTED.

---

[5]     Plaintiffs contend that this conclusion should not control because Congress amended Section 3 in 1994 without repudiating cases that had found a private right of action in section 1701u. Plaintiffs' contention is generally entitled to little, if any, weight. *See Alexander*, 532 U.S. at 292. Plaintiffs' argument is further undermined by their acknowledgement that case law interpreting section 1701u is, even now, "sparse." Moreover, the case law that existed when Congress amended Section 3 included conflicting decisions as to the existence of a private right of action to enforce section 1701u. *Compare Milsap v. U.S. Dep't of HUD*, Civ. No. 4-89-635, 1990 WL 157516, at *9 (D. Minn. Oct. 18, 1990) ("Case law interpreting the parameters of Section 1701u is extremely sparse. That law indicates, however, that some private cause of action may exist."), *with Concerned Members Comm. of Chatham Park Vill. Corp. v. Bd. of Dirs. of Chatham Park Vill. Coop.*, No. 81 C 2699, 1981 U.S. Dist. LEXIS 13608, at *8 (N.D. Ill. July 13, 1981) ("[P]laintiffs have failed to suggest any reason why the court should imply a private cause of action on behalf of these plaintiffs. Under these circumstances, the court holds that § 1701u does not provide a private right of action for these particular plaintiffs.").

3. This case is DISMISSED for lack of subject matter jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 6, 2007

s/ Joan N. Ericksen  
JOAN N. ERICKSEN  
United States District Judge
